Good morning, your honors. It's a pleasure to be here, this morning still. My name is Charles R. Garner. I'm the appellant. I'm acting as a pro... Pro se. Pro per, yes. The issue before the court... You're not flying blind today, are you? No, sir. The issue before this court is actually the termination of the appellant by Delta Airlines and the procedures and ramifications thereof. You need to kind of speak up just a little bit. We can eliminate the doctrine of employment at will because the termination proceedings are pretty much covered by 45... Title 45 U.S. Code Chapter 8 And it is sections 151 through 188. That's commonly known as the Railway Labor Act. The contract between Delta Airlines and the Airline Pilots Association acknowledges the concurrency of that statute. Mr. Garner, can we focus on the specifics of this case? I'm not disagreeing with what you're saying about the Railway Labor Act, but it seems to me that the real issue we're dealing with here is the third prong of the test, at least established by O'Day v. McConnell-Douglas helicopter. Do you agree with that? Yes, sir. I gather both parties agree that the first two prongs have been established, so we're really talking about whether there's a causal link between the protected activity and the adverse action. Is that correct? Yes, sir. Okay. So in this case, your burden is relatively minor in order to get you to a trial under Lindahl v. Air France. I would have to agree with that. And what specifically, what evidence do you cite that meets the standard of Lindahl? Well, the causal effect is actually the actions initiated by Delta Airlines in the termination. They followed specifically the contractual factors of the Railway Labor Act as it actually applies to the contract. They initiated the proceedings. They established 15 causes of action. This is the arbitration proceedings you're talking about before the five-member board? It has to start with the hearing officer first. And so that is a junior base pilot who comes in and presents to the individual precise, and that's the word that's exactly used in the contract, the precise charges that are being charged against him. Doesn't that really do – I mean, that really is the equivalent of the business's stated reason for terminating you. Isn't that right? They upheld that. They said that the airline was justified in the reasons that it gave. That's what the five-member board said. Is that correct? If I can continue on, it will make a little bit more sense. So it went to the hearing examiner, hearing officer, base chief pilot. The appellant, myself, denied the charges. It was brought then in a timely fashion to a four-man board. A four-man board consists of two company individuals and two airline employee individuals. They deadlocked on their decision. In the appropriate timeframe then, the Airline Pilots Association filed for the five-man board. We call it the board. We have now switched from the Section 18 of the contract to a Section 19 of the contract, which has to do with termination. At the termination hearing, the chief pilot of Delta Airlines verbally dismissed 13 of the 15 charges that was brought against myself. There is no separability in the contract, so the contract should have or the proceedings should have stopped at that time. However, they proceeded. You said there's no separate what? Building? Separability. There was 15 charges, and the chief pilot said that 13 of the charges were not sufficient to terminate. Okay. So you're saying severability, right? Yes. Oh, severability. I thought you said building. My pronunciation. I'm sorry, Your Honor. Would you like a little water? Oh, I could use some, but I can continue. We'll give you. No, there's water. Yeah, here. Your counsel can get some. We give better service than the airlines are giving. There's no charge for that. No charge for that. The bathrooms are free, too. Okay. According to Section 19 of the contract, the five-man board has 90 days to render their decision. It was brought to Mr. Boyce's attention, the counsel for Delta, approximately 170 days later, from the last time that the brief that this 90-day starts from was filed, that it hadn't been filed correctly. So at that point, the proceeding should have dropped, and I should have been returned to service. Delta continued to proceed with the termination, and I was terminated. That brings us into. . . You skipped a step here. You say 190 days passed, and the five-person board didn't make a decision. That's correct. Didn't it ultimately make a decision, whether it's untimely or not? No, sir, they did not. So no decision was made. So you're saying just under the contract, you should have been returned to service. That is correct, sir. So that brings us down to the prong that you were talking about. And the prong that we're talking about, if I was not terminated for cause, then I must have been terminated for some other reason. The other reason was, I think, pretty well expressed in the brief before this court by Mrs. Boyle, who was my attorney at the time. Unfortunately, I have to represent myself because I had two attorneys on this case, and they were both disbarred. Disbarred? Yes, sir. Oh, my goodness. They don't have immigration law as well, do they? I was going to say that. Well, one of them did. One of them did. I've seen them. And Mrs. Boyle, she left private practice and went into corporate practice, so she could not represent me in front of the bankruptcy court. You were disbarred and went into corporate practice? No, no, no. There was two males and one female. The two males were disbarred. Disbarred, yes. It's the only fair. Yes. What corporation is she working for? She's working for one to two different. Her name is Ms. Boyle, and I think she's had cases before the court here. She works for a new law firm now. Okay, all right. She was doing copyright work for a while. You're doing fine. Yeah, you're doing fine. So the, I had. . . You're talking about your retaliation claim. That is correct. Okay, and you're looking at the third prong of that. That's the third prong. What's your evidence of retaliation? Well, I was terminated for one. That's retaliation. Retaliation for what? For claiming age discrimination, and I had previously with Delta filed for age discrimination because I was on long-term disability, and Delta Airlines at the time did not have flight engineers, and I reached my age 60 on long-term disability. Delta then changed their procedures and let pilots become flight engineers that had been captains. At that point, I sued a lot of medical stuff. I got my first-class physical back, applied to the airlines for reinstatement, and they denied me. They had taken on a handful of Western captains that were junior to me. So you're applying for being a new hire, right, in that case. You weren't hired at that point. No, sir. I regained my original seniority and date of hire and everything else. At that point, during the EEOC and Mr. Boyce's concurrence, there was an agreement. I'd go back to work with no retaliation. And after we started in this termination this time, or this is the only time, I put on a couple of pieces of paper that involved a transfer. I put that this was age discriminatory. The reason it was age discriminatory is you have basically two sections of pilots. You have a new hire pilot who is a pilot flight engineer, and you have an old pilot who is a flight engineer, cannot no longer be a pilot, but he can be a flight engineer. The way the Delta transfer system was set up, if you transferred when you were as a senior person and you got laid off because the airplanes were no longer flying, you had to pay back the money. If you were a junior pilot and they got rid of the airplanes, you just went from being a flight engineer to a pilot, and you didn't have to pay back any money because you may have 30, 40 more years to go. So I claimed that was age discriminatory. I had it put in my files. Let me ask you this. You're claiming that Delta fired you in retaliation for complaining against Delta's age discriminatory policies.  That is correct, sir. Okay, and then you wrote a letter to Delta in 2001 about that age discriminatory policy that you perceived, and then you filed lawsuits against Delta in 1994, and they had a class action about Delta's seniority policy, and then in 1995, you filed an EEOC claim because you wanted to fly in a three-man cockpit after you turned 60.  Okay, and now you're claiming that you established a prima facie case of retaliation because Delta personnel knew that you had made age discrimination complaints about Delta, and that Delta began to investigate your move only several months after you made this complaint in March 2001, and then they fired you less than 11 months later. That is correct, sir. All right, and then Delta articulated legitimate non-retaliatory reasons for termination. It believed that you had fraudulently violated their relocation policy, and then we come to the third step, and you're saying that you provided enough evidence to establish a disputed issue of material fact whether Delta's explanation about violating the relocation policy was a pretext, and then I think you're saying that the relocation policy was ambiguous because Delta said that it had a common-sense approach and considers a mosaic of factors to determine whether a pilot has effected a permanent move. This went back to that moving to Atlanta, being there for four months, and coming back to L.A. when you lived in Seattle, but then you're saying that the evidence shows you're saying that Delta didn't provide this information to the pilots before they made the move. That's the common-sense approach and the mosaic of factors, so you didn't have any idea what they're talking about, and then you also are arguing that Captain Rigney violated the policy, but he wasn't fired. He just repaid Delta for those moving expenses, so your argument is that there's genuine issues of fact concerning whether you were fired, and what they've said about you was pretextual. That's your argument. That's pretty much my argument, yes, sir. Why don't we hear from Delta then? Okay. You've got a couple minutes left. May it please the Court, my name is Bill Boyce, and I represent Delta Airlines in this case. If I might clear up a couple of facts in the sequence of events, the case is a retaliation case. That's absolutely correct, Your Honor, and I think you've adequately laid out what the case is here. The prima facie case, though, is a very weak prima facie case. Let's say you're correct about that. I gather that on the three prongs, the Delta doesn't dispute the first two. It's really the third prong that we're talking about, right? That's correct. And you agree, at least in my reading of Lynn Dahl, and I'm quoting here, the plaintiff who has established prima facie case need produce very little evidence of discriminatory motive to raise a genuine issue of fact as to pretext. Do you agree that's a fair reading of that? I think it's very little evidence on the causation. On the issue of pretext. As I look, being real candid with you, as I look at what we've got here, Mr. Garner doesn't have, I don't know what his chances are at trial, but we're stuck with the rules of the game here, and it seems to me that on a summary judgment basis, although, like I say, he may have little chance at trial, hasn't he raised enough issues to meet this very minimal threshold to solve that third prong? Your Honor, the third prong is the causation prong to reach a prima facie case. Correct. That requires very little evidence. Right. The evidence that he has in this case to satisfy that is that he made a complaint, and before the decision was made to terminate him, the company was aware of that complaint. That's a very minimal burden to meet the prima facie case. Well, he's been a pain to your legal department over the years. Let me tell you, frankly, since you're talking to three judges who are impartial, looking at these facts is enough to go to a jury. You may very well win. You may well want to take the chance. But you look at this record, and you can see that the people in the legal department go, let's get rid of this guy. They found a good excuse. He made a misrepresentation. They said, let's get him, and they did. Now, you may say, well, but there's enough to go to a jury. I'm speaking for all three as I hear us. So that's the case you'll win. Don't try to redo it. You're dealing with those facts. You may not want to settle. You may want to go to a jury. That's where you are. Your Honor, if I might. That's where you are. So understand that and see where you go from there. All right, Your Honor. Let me just tell you this. We've never talked about this. We don't talk about these cases. I'm just hearing some of this for the first time. We all are. If I might go through the facts of the case. Why do you do that? You know where we stand. Well, Your Honor. Are you going to persuade us? I would like to, yes. I would like to try. Just try. And the prima facie case here raises an inference of retaliation. That is, if he shows that there's an adverse employment action, he engaged in protective activity, the company knew about it, it raises an inference. Once the company articulates a legitimate non-discriminatory reason, sets forth that reason. Your Honor, that's the law. Why don't you tell us what facts make this not a jury issue? Because the company showed that it terminated him because he fraudulently sought relocation benefits for a move he did not make. With respect, Counsel, I don't know exactly what Mr. Garner was making with you as a flight engineer, but according to the record, as I understand it, his net benefit was $600 approximately. Why wouldn't that be a jury question as to whether or not there was a pretext involved here? I mean, you'd have to be, to use the President's words, stupidly involved in something to do that. I mean, it makes absolutely no sense that he would give up that career for $600. It doesn't make any sense. And when you add these other things that Judge Fragerson talked about, the ambiguousness of things, the way different people were treated differently for doing something very similar, that gets back to Judge Noonan's point that at the end of the day, whatever we think about Mr. Garner's case, we're stuck with the fact that under Lindahl, it seems like Mr. Garner has raised that very little bit of evidence, and that may be all he's done, raised that very little bit of evidence to take it back to a trial. I think we have the burdens a little bit mixed here. Once the company has articulated legitimate non-discriminatory reason, the burden is on the plaintiff to come forward with substantial. No, no, no. That's not correct. What Lindahl says is that the plaintiff, who has established a prima facie case, need produce, and I'm quoting, very little evidence of discriminatory motive to raise a genuine issue of fact as to pretext. I'm quoting the case. So the reality is, yes, it's his burden. He has raised, by my count, five different points. Some of them are weak. Some of them are stronger that meets that very little evidence level, and that's all he needs to do in this type of a case to satisfy the third prong, isn't it? No, Your Honor. He has to raise specific and substantial evidence that the reason is pretextual. If he had evidence of the company's unlawful motivation, then it may not take much. There is no such evidence of the company's motivation. The factual scenario is a little bit awkward. Well, you'll agree he only got $600 out of it. Yes, Your Honor. Well, he had the company. The company paid more than that. I know that, but he got $600. Your Honor, yes. He got the $600 that he got by saying he was making a permanent move. I know. We know the story. When he never did. Does it shock you? Well, it's my last thing to do. Your Honor, it does to have a pilot for Delta Airlines lie to the company, and other pilots who have lied to the company have been terminated. There's evidence in the record here, and this I was just going to cite as one of these minimal things, that there have been other people who have done substantially similar things who were not terminated. No, Your Honor. The evidence is about this decision-maker, Mr. Tutte, the chief pilot. The other people who have been terminated is one other person, one other pilot he's terminated for lying, and that was Mr. Dixon, who falsifies some divorce papers. It was an integrity issue like it was for Mr. Garner. There have been other pilots who violated this same policy, who had not engaged in any protected activity, Mr. Puz, who was younger than Mr. Garner, who was also terminated. There is a very – There's no actual evidence of that. You weren't able to produce any evidence of that other than somebody stating that that was the case. Isn't that correct? About – Mr. Puz. No, it is undisputed that Mr. Puz also violated – According to my information, there's no record of evidence of this pilot or any facts about the situation except your answer to an interrogatory. Is that correct? There was very little evidence about the specifics of it. There is no question, it's not disputed in the court below, that there is no question about it that Mr. Puz violated the relocation policy, was investigated just like Mr. Garner and Mr. Rigney, and was found to have intentionally sought benefits to which he was not entitled. Was Rigney terminated? Rigney was not terminated. Rigney was investigated for the same situation, the same violation of the policy. The investigation, however, showed for Mr. Rigney, who was older than Mr. Garner, who also had engaged in protected activity, who you would say the company saw him as a pain too, he was not terminated because the investigation showed that his story made sense. He did not, as Mr. Garner did, have the moving company try to move some junk. He did not, when they called him on that, say, throw it all away, just send this one box so Delta will pay me so I can drive across the country. He did not do any of those types of things. And when he said, no, Mr. Rigney, you are not entitled to that, he said, well, it looked to me like I have this condo, I should have been, but if you say I'm not, I'm not, I'll give the money back. It's a totally different situation factually as to whether there's a difference. There is a very important Was Mr. Garner offered an opportunity to return the money? That never came up with Mr. Garner because the facts of his situation. Were you on the road? No, Your Honor. The investigation of Mr. Garner began not after he filed this, put this note on the form. It was when the company, the moving company, called Delta and said, we've got a situation here where you've got a pilot who's just sending junk, and he says, throw it all away, and then he says, send this one box so I get paid for my move. They called. We investigated. We didn't go looking for him because he was a pain. That's the sequence of events, and it's important. And that's what may ultimately make you successful at trial. But, Your Honor, that's why I say it's a weak prima facie case. Then the question is, is there any evidence of pretext here? And this is where this case is very different from the run-of-the-mill retaliation case. And the reason for that is because this case went to an independent arbitration. And that arbitrator found That didn't deal with pretext. That dealt with whether or not there was a bona fide basis, business basis for firing him. It does deal with pretext in a real sense, Your Honor, because what it shows is that an independent neutral found just cause to terminate But, you know, you read his opinion, and he says, this is a very harsh treatment. He really is, you know, the question, of course, lying to get some money is not a good thing. But it's also not a good thing. I mean, to fire an old employee and not so much of you as a Pan Am, because you were looking out to get him. And that arbitrator did not really jump with joy at what you were doing, but he felt under the contract that was all right. I think Your Honor may be talking about the district court judge. No, I'm talking about the arbitrator. The arbitrator said that there really was no question in his mind that you could not look at these facts and come to any other conclusion, other than this pilot tried to game the system and got caught. As to that, but as to the penalty, he said the real question before us is the penalty. Yes. And it's a very harsh penalty. Yes. And what he, I'm sorry. And it is a very harsh penalty. Yes. And what he said was the company has the right to expect integrity from its pilots, and it terminates people who lie to it. Yeah, but the retaliation of that was not before the arbitrator. So that's going to be a different issue before the jury. You've heard what we think. You know what the neutral arbitrator thought. Your policy is harsh to the point somebody would say, well, it's not very human. So you go to the jury. You can take your chances. I understand. You know what you remind me of so much, of people who come up here representing the government, and they're soldiers. They will die for the government. But you're in private practice. You can make judgments. I am making a judgment, Your Honor. In this situation, I believe in integrity. I believe in not taking advantage of the situation and trying to steal any amount of money, whether it's one cent. We're all in agreement on that. I don't think so, Your Honor. It's quite reprehensible. But there are sanctions and sanctions. I understand that. And integrity is important in a pilot. Mr. Boyce, can I just get back to the pretext issue for a moment? Mr. Garner represented to us that there were 15, if I recall correctly, 15 charges that were filed against him by Delta, that 13 of the 15 were summarily dismissed. Is that a correct statement? I do not believe so. I think the only issue before the system board was his termination and whether there was just cause for the termination. The termination was for falsely claiming relocation benefits. Right. It's the same legitimate, non-discriminatory reason that knocks out his prima facie case for retaliation. And the system board found, the neutral found, that that cause was absolutely correct, that there was good cause to terminate him for that. Was he correct about his statement that in the initial, I don't think it was, I don't know whether it was mediation or arbitration under the Railroad Labor Act, that there was a deadlock about an initial termination. Is that correct? That is the normal process, Your Honor. What happens is it's a sequential process. Right. No, I understand that. I'm just asking whether he is accurate in his statement that there was a deadlock. No, you file a grievance, the union files the grievance. The first stage is with a company representative. The second stage is with two unions, two companies. And that's where the deadlock was. Those often, those regularly deadlock. I'm not surprised with that, but that was the deadlock. That's correct. And then he goes to the system board, and he did misspeak about that. There is a decision by the system board, by the neutral. It's in the record. I could give you this item. No, we have that. I just wanted to make sure that I understood it. Okay. And that does make a lot of difference in this case. If I might just call the Court's attention to one case where this same factual situation came up. It's a district court case that has come up since the original briefing in this, before Judge Charles Breyer in the Northern District. And it deals with exactly this situation. What's the site? The site is, I'm sorry, I only have a Westlaw site because it's not reported. But it's 2006 Westlaw 733-467. You ought to give it to Mr. Garner. I will, Your Honor. What's the name of the case? It's Smith v. United Parcel Service. Put it on. We have these gum sheets. See them over there. All right. Write it down. I will do that. But it goes through in detail how the prima facie case, that step. And then when you articulate it. I know that you probably don't appreciate the fact on this. But we actually do understand the burdens. We understand each level and who has the responsibility to do what. We get these cases all the time. And it seems like the difference is on the level of evidence that needs to be established. And therein it seems like we may have a different viewpoint, but understand that we don't quarrel with Delta's right to pursue, as it deems fit, its particular policy. But the reality is what we're dealing with here is whether Mr. Garner has raised a level of evidence sufficient to satisfy Lindahl. And that's our decision. And I understand that, Your Honor. And the district court judge went through that evidence and found that the evidence to establish the prima facie case was just the notice of this notation. And there was no other evidence of pretext. And that's not enough. He looked at all of the evidence, and it's all listed there, just like the neutral looked at all the evidence, and found that there is only one conclusion that can be reached. There is simply not any other evidence. So your perspective is that the five or six different things that we've collectively talked about here are not responses to pretext. They're not pretextual arguments. They are something else. Save for the one about Mr. Rigney. That is the only one that might qualify, except for the fact that as a comparator, Mr. Rigney doesn't make it because he also engaged in protected activity. So for the comparator to raise an issue of pretext, you need to have someone who did the same thing but is not in the protected class and is treated differently. Mr. Rigney arguably did the same thing. We say the facts are different. But if he did, he is also in the protected class. So he doesn't raise any issue of pretext. He raises an issue that there must be something different in his facts. And obviously there is. So there is no evidence other than this notation on the form that the company learned about after it began the investigation. And all that notation says is he believes it's discriminatory, age discriminatory, to require someone who either resigns or retires within 12 months of getting relocation benefits to return them. That's not age discrimination. It's just treating someone who's no longer there the same. Thank you for that information. All right. And the legal department looked at that and said there really is nothing here. Let me ask you this now. The third seat in the plane that he's occupying or he was occupying, the flight engineer's seat, that's usually the spot for the junior pilot, as I understand it. Now, those third seats are being phased out. They're already gone, Your Honor. They're already gone. And they've been gone since 2003. 2003. So if he wanted to fly again, where would you put him? There is no longer a position which under federal law he could serve in because the federal law requires that pilots and co-pilots now have to be under 65. And he's over that age. 65? Yes. But he was not eligible after 2003 to continue flying in any position. So we're talking about a period here between 2001 when he engaged in misconduct and 2003 when there were no longer any second officer positions in which he could serve. So it's a historical situation only here. So I see. But, you know, 65 is a rather young age, isn't it? It was 60 up until a couple of years ago, Your Honor. It doesn't apply to judges. No, and luckily it does not apply to lawyers either. But, yes, it is a young age. The company allowed. . . How old was that pilot that landed the plane in the Hudson River? He was 58 or 59, I think. I'm sure he was under 60. He was close to retiring. I think that was before. . . It may be older, but I think it was before they changed the age 60 rule to 65. I'm not positive about that. Well, you're probably not paid to take advice from judges. You come up and you've made as strong a case as you could, and maybe this two years' difference is so important to Delma that you want to go through a trial. But I think you've heard each one of us speak, and you know what the result is going to be. So you can go back and tell the company, well, we lost it up here, but we'll get ready for trial. I hear you, Your Honor. I hope that is not the case. Well, I'm telling you. Why do you doubt me? I don't doubt you, Your Honor. I just hope. . . Hope? Well, I suppose some illumination will strike us. Well, there's hope for that. Thank you. But you might act more prudently if you did something else. Let the poor guy sit down. Thank you for that, Your Honor. You don't need rebuttal. You don't need rebuttal.
judges: Pregerson, Noonan, Smith M.